1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

San Francisco Division

11

| | |
|---|---|
| MONOLITHIC POWER SYSTEMS, INC., | Case No. 20-cv-06752-JSW (LB) |
| Plaintiff, | **DISCOVERY ORDER** |
| v. | Re: ECF Nos. 132, 134, 136, 142 |
| WEI DONG, et al., | |
| Defendants. | |

| | |
|---|---|
| MONOLITHIC POWER SYSTEMS, INC., | Case No. 22-cv-01986-JSW (LB) |
| Plaintiff, | (consolidated) |
| v. | |
| MERAKI INTEGRATED CIRCUIT (SHENZEN) TECHNOLOGY, INC, | |
| Defendants. | |

**INTRODUCTION**

Monolithic Power sued two former Monolithic employees (Lin Sheng and Wei Dong) and their new company, Meraki. The former employees allegedly took Monolithic's confidential information and used it to obtain patents, create semiconductor products, and found Meraki, which is located in China and competes with Monolithic. The remaining claim against the former employees is breach of their employment contracts based on the misappropriation of confidential information. The

ORDER – Nos. 20-cv-06752-JSW (LB), 22-cv-01986-JSW (LB)

United States District Court
Northern District of California

claims against Meraki are patent infringement, theft of trade secrets, tortious interference, and unfair competition.[1] The parties have four discovery disputes: (1) whether Meraki must respond to interrogatories 6–9 and whether the former employees must supplement their responses to interrogatories 15 and 17; (2) whether the defendants can depose Monolithic's CEO Michael Hsing about his hiring of Ms. Sheng and his alleged pressuring of her to disclose her former employer's confidential and trade-secret information; (3) whether the defendants can depose Monolithic's General Counsel Saria Tseng about the business circumstances surrounding Ms. Sheng's departure; and (4) the location of the former employees' depositions.[2]

Meraki must respond to the contention interrogatories: they are not premature. The former employees must amend their responses to interrogatories about what happened to Monolithic's information. If there is a fact record (presumably through Ms. Sheng's deposition) that supports the allegations about Mr. Hsing's pressuring her to reveal confidential information, then the defendants may depose him on this topic at the end of discovery. The deposition of the attorney is denied: it is not crucial to the defendants' case. The in-person location for the depositions of the former employees is in Macau or Hong Kong.

**ANALYSIS**

**1. Interrogatories (Letter Brief – ECF No. 132)**

The issues are whether Meraki must respond to interrogatories 6–9 (or whether they are premature contention interrogatories) and whether the former employees must supplement their responses to two interrogatories. The defendants must respond to the interrogatories.

First, Meraki does not resist interrogatories 6–9 on any ground other than they are premature contention interrogatories.[3] Contention interrogatories are governed primarily by Rule 33(a)(2):

> An interrogatory may relate to any matter that may be inquired into under Rule 26(b). An interrogatory is not objectionable merely because it asks for an opinion

---

[1] Order – ECF No. 37 at 1–2 (summarizing case); First Am. Compl. – ECF No. 39 at 2 (¶¶ 2–3), 16–18 (¶¶ 62–68, 71–72); Third Am. Compl., No. 22-cv-01986-JSW (LB) – ECF No. 96. Citations are to Case No. 20-cv-06752-JSW (LB) unless otherwise noted and refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Disc Letter Brs. – ECF Nos. 132, 134, 136, 142.

[3] Disc. Letter Br. – ECF No. 132 at 5.

United States District Court
Northern District of California

or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.

Fed. R. Civ. P. 33(a)(2).

"Courts using their Rule 33(a)(2) discretion generally disfavor contention interrogatories asked before discovery is undertaken." *In re eBay Seller Antitrust Litig.*, No. C07-1882 JF (RS), 2008 WL 5212170, at *1 (N.D. Cal. Dec. 11, 2008). "In fact, courts tend to deny contention interrogatories filed before substantial discovery has taken place, but grant them if discovery almost is complete." *Id*. Thus, as a general rule, a party moving to compel responses to contention interrogatories at an early stage in litigation must show that the responses would "contribute meaningfully" to one of the following: (1) clarifying the issues in the case; (2) narrowing the scope of the dispute; (3) setting up early settlement discussion; or (4) exposing a substantial basis for a motion under Rule 11 or Rule 56. *In re Convergent Techs. Secs. Litig.*, 108 F.R.D. 328, 338–39 (N.D. Cal. 1985); *Nitride Semiconductors Co. v. Rayvio Corp.*, No. 17-cv-2952-EJD (SJK), 2017 LEXIS 206011, at *4 (N.D. Cal. Dec. 14, 2017). "These guidelines are not to be applied rigidly, and so any decision must be made on a case by case basis." *HTC Corp. v. Tech. Props. Ltd.*, No. C 08-00882 JF (HRL), 2011 WL 97787, at *2 (N.D. Cal. Jan. 12, 2011); *see In re eBay Seller*, 2008 WL 5212170, at *1 & n.3 (acknowledging "non-rigid rule"). The requesting party has the "burden of justification" to overcome the "general policy [] to defer propounding and answering contention interrogatories until near the end of the discovery period." *In re Convergent Techs.*, 108 F.R.D. at 336.

Fact discovery closes on March 3, 2023.[4] Claim construction was a year ago. Monolithic served amended infringement contentions four months ago.[5] The parties have a settlement conference on February 9, 2023.[6] The interrogatories ask for Meraki's contentions regarding non-infringement and unenforceability of patents and trade-secrets. Interrogatory 9 asks only for information about

---

[4] Order – ECF No. 141.

[5] Disc. Letter Br. – ECF No. 132 at 3.

[6] Order – ECF No. 124.

Meraki's design-around efforts. The interrogatories are not premature, at least when one considers the timeline of the case. That said, the parties' scheduling of depositions during the last month of discovery complicates that conclusion, at least somewhat. The defendants are not wrong that their contention interrogatories are more appropriately staged after the Monolithic depositions. On the other hand, the parties have to live with the case schedule. The best that the court can do is to order the parties to schedule Monolithic depositions first, then provide a week's time to respond to contention interrogatories, and then schedule the Meraki depositions. The court can do no better than that given that the parties are scheduling everything in February. The defendants may amend their contention interrogatories one week after expert disclosures.

Second, the parties dispute the adequacy of the former employees' responses to interrogatories 15 (Ms. Sheng) and 17 (Mr. Dong). Monolithic's forensic examination of their Monolithic laptops showed they had 220 Monolithic files. In their discovery responses on September 30, 2022, the former employees admitted that they had forty of these files. Monolithic since identified seventy-five more files. The interrogatories ask for information about the files:

> Describe the history and status of each of [your] External Drives, including: (a) a description of what each is, (b) where it currently is, (c) what MPS [Monolithic] Files were placed it, (d) what MPS Files remained on it when you left MPS, (e) whether, how, and when any MPS Files that remained on it when you left MPS were deleted, removed, or otherwise disposed of, (f) what has happened to it since you left MPS, (g) if you disposed of or transferred it, when and how you did so and/or who you transferred it to, and (h) if you claim to be unable to locate it, what steps you took to search for it.[7]

Lin Sheng's corrected response to the interrogatory as follows:

> Sheng used a Western Digital My Passport external hard drive before, during, and after her employment with MPS. To the best of Sheng's knowledge, this Western Digital My Passport was lost or discarded sometime in 2020. The Western Digital hard drive contained personal files and non-confidential information regarding the integrated circuit industry, some or all of which predated Sheng's MPS employment. Based on investigation conducted to date, we are unaware of any MPS confidential or trade secret information being copied onto the Western Digital hard drive.

---

[7] Disc. Letter Br. – ECF No. 132 at 4; Resps. to Monolithic's Third Set of Interrogs., Ex. A to *id.* – ECF No. 131-2 at 10, 15 (punctuation cleaned up).

United States District Court
Northern District of California

Sheng may also have possessed USB flash drives during her MPS employment. Any such flash drives were lost or discarded prior to the commencement of the current litigation.

Although we are unaware of any evidence that MPS confidential or trade secret information was copied onto Sheng's Western Digital hard drive, much less transferred to her Meraki laptop, counsel took possession of Sheng's laptop in October 2020 to remediate any possible inadvertent or intentional possession of MPS information. Counsel diligently searched the Meraki laptop and has produced all MPS-related information found thereon. Such information no longer is available to Defendants, except as permitted under the Protective Order in this case.

In response to requests for production in this case, Sheng conducted a reasonably diligent search for responsive documents or things, including any external hard drives and/or USB drives possessed during her MPS employment or otherwise containing MPS information. Subject to Defendants' objections, all responsive documents and things have been produced which could be located through a reasonably diligent search. Defendants also have searched for and produced documents on Sheng's Meraki hard drive that contain MPS information of any kind, whether public or non-public, confidential or non-confidential.[8]

Wei Dong's response was similar: the last three paragraphs were identical, and the first paragraph differed slightly in that it referred to two external hard drives, not one. In his initial response, he said that he endeavored to delete any Monolithic files on his USB devices when his employment at Monolithic ended, he discarded his two external drives in 2019 and 2020 due to their loss of functionality, and he discarded other USB drives due to loss of functionality at a time unknown (but before this litigation).[9]

The issue is whether these responses sufficiently answer the questions in paragraphs (c), (d), and (e) of the interrogatories: what Monolithic files were placed on the drives, what files remained when the former employees left Monolithic, and whether, how, and when Monolithic files were deleted or removed from the drives.

Monolithic contends that the former employees dodged these questions by failing to address what happened to the Monolithic files that they put on their external drives, how the files ended up on their Meraki computers, and what happened to the files in between.

Rather than answer what happened with any "MPS files" they put on their external hard drives, defendants only deny knowing or remembering that there was any MPS

---

[8] Sheng Interrog. Resp., Ex. A to Disc. Letter Br. – ECF No. 131-2 at 16–17.

[9] Dong Interrog. Resp., Ex. A to Disc. Letter Br. – ECF No. 131-2 at 11–12.

"confidential or trade secret information" copied onto the external drives, which appears based on Defendants' own pre-determination of the merits that none of the MPS files they took rise to "confidential or trade secret information." In short, Defendants refuse to address the MPS files that they took because they have prejudged that those files will not sustain MPS's claims on the merits.[10]

The former employees counter that they responded sufficiently: (1) they answered (c) — what Monolithic files were placed on their hard drives — by saying that the hard drives had personal and non-confidential information regarding the integrated-circuit industry, "some or all of which" predated their employment; (2) they answered (d) — what Monolithic files remained on their hard drives when they left Monolithic — by their response that the files were personal and non-confidential and by their representations that counsel searched their Meraki laptops and produced all Monolithic-related information found on them; and (3) they answered (e) — whether, how, and when Monolithic files were deleted or removed from the drives — by answering (for Ms. Sheng) that she lost or discarded the drives and (for Mr. Dong) that he tried to delete Monolithic files and discarded his drives. They contend that Monolithic never asked "what happened to the MPS files," how the files ended up on their Meraki computers, and "what happened to them in between." They point to new interrogatories, served after Monolithic exchanged its part of the letter brief, that ask these questions more precisely. They assert that if Monolithic is asking for a file-by-file description about what happened to the files, then the request is burdensome. They conclude that Monolithic should get any additional information through depositions.[11]

The new interrogatories may moot the issue: the Sheng interrogatory asks for how Monolithic files "came to be on your Meraki devices," including copying and moving of files "since you left MPS, every other non-MPS device they have been on since the beginning of your MPS employment, and any other person to whom the files have been transmitted or otherwise shared with."[12] The former employees' interrogatory responses in any event are not sufficient: (1) saying that the drives had personal and non-confidential information does not answer "what Monolithic

---

[10] Disc. Letter Br. – ECF No. 132 at 4.

[11] *Id.* at 6–7 & Monolithic's Fourth Set of Interrogs., Ex. B to *id.* – ECF No. 132-2 at 4.

[12] Monolithic's Fourth Set of Interrogs., Ex. B to *id.* – ECF No. 132-2 at 4.

United States District Court
Northern District of California

1    files were placed on their hard drives" or "what Monolithic files remained on their hard drives when

2    they left Monolithic;" and (2) saying that they lost or discarded their external drives does not

3    answer "whether, how, and when Monolithic files were deleted or removed from the drives."

4        The defendants may well have performed a sufficient scrub of available devices (searching for

5    them and examining what they have). At some point, Monolithic may not be able to get fuller

6    answers. But it is entitled to straight answers to its interrogatories and, given the defendants'

7    suggestion of depositions, to test those answers through depositions. Also, the parties must confer

8    on any burden raised by the new interrogatories reflected in Exhibit B. The court's extensive

9    conversation with the parties at the hearing also should inform their approach to this issue.

10

11    **2.  Hsing Deposition (Letter Brief – ECF No. 134)**

12        The defendants want to depose Monolithic's CEO, Michael Hsing, because after he hired Ms.

13    Sheng, he allegedly pressed her to disclose her former employer's confidential, trade-secret

14    information. If the defendants corroborate this through Ms. Sheng's deposition, then the

15    defendants may depose him on this topic at the end of discovery.

16        "When a party seeks the deposition of a high-level executive (a so-called 'apex' deposition),

17    courts have 'observed that such discovery creates a tremendous potential for abuse or

18    harassment.'" *Jensen v. BNSF Rwy. Co.*, No. 3:13-cv-05955-HSG (LB), 2015 WL 3662593, at \*2

19    (N.D. Cal. May 19, 2015) (quoting *Apple Inc. v. Samsung Elecs. Co*., 282 F.R.D. 259, 262–63

20    (N.D. Cal. 2012)). "The court therefore has discretion to limit discovery where the discovery

21    sought can be obtained from some other source that is more convenient, less burdensome, or less

22    expensive." *Id.* (cleaned up). "In determining whether to allow an apex deposition, courts consider

23    (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in

24    the case and (2) whether the party seeking the deposition has exhausted other less intrusive

25    discovery methods." *Id.* at \*3. "A party seeking to prevent a deposition carries a heavy burden to

26    show why discovery should be denied." *Id.* "Thus, it is very unusual for a court to prohibit the

27    taking of a deposition altogether absent extraordinary circumstances." *Id.* (cleaned up). "When a

28    witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO

is subject to deposition." *Id.* "A claimed lack of knowledge, by itself[,] is insufficient to preclude a deposition." *Id.*

According to the defendants, Mr. Hsing hired Ms. Sheng, who was a star engineer at Texas Instruments. Then, he allegedly pressured her to disclose Texas Instrument's confidential and trade-secret information about Isocap and other semiconductor technology. (As Monolithic's CEO, Mr. Hsing has "unique first-hand, non-cumulative knowledge" of Monolithic's development of synchronous rectifier technology and his plans for Monolithic's future development of products, including with Isocap technology.) Documents that Monolithic identifies as its confidential information and trade secrets "originated from" Texas Instruments, not Monolithic. Ms. Sheng told Mr. Hsing that she was concerned about providing Texas Instruments' information, and he responded that she need not worry because "MPS is very good at such lawsuits." Mr. Hsing's "personal efforts to induce Ms. Sheng to disclose TI's [Texas Instruments'] trade secrets prompted Ms. Sheng to leave MPS after only seven months." The defendants offer to depose Mr. Hsing last and limit his deposition to 4.5 hours. They "do not intend to retread ground covered with other witnesses."[13]

Monolithic resists the deposition on the ground that other Monolithic employees interviewed Ms. Sheng, Mr. Hsing's knowledge thus is not unique, and the defendants have not tried to depose the other interviewers or persons with knowledge. Moreover, Ms. Sheng's allegation is untested: her attorneys raise the issue, and no sworn testimony supports it. Monolithic concludes that the dispute is premature and cannot be addressed until there is a fuller record.[14]

Most of the circumstances surrounding Ms. Sheng's hiring are addressable through depositions of other percipient witnesses and Monolithic's Rule 30(b)(6) witness. Monolithic has established that an apex deposition on these points is not necessary because there is no basis to conclude that other witnesses cannot address them. *Cf. Affinity Labs of Tex. v. Apple, Inc.*, C 09-4436 CW (JL), 2011 WL 1753982, at *6 (N.D. Cal. May 9, 2011) ("Courts regularly require interrogatories,

---

[13] Disc. Letter Br. – ECF No. 134 at 5–8.

[14] *Id.* at 2–4.

United States District Court
Northern District of California

1    requests for admission, and depositions of lower level employees before allowing the deposition of

2    an apex witness"). But the contention here is that Mr. Hsing pressured Ms. Sheng directly to

3    disclose Texas Instruments' confidential and trade-secret information. He (and Ms. Sheng) are the

4    only percipient witnesses, and their testimony apparently is the only means to uncover the

5    information. That said, the predicate for the testimony is attorney argument, not evidence. Thus, if

6    Ms. Sheng corroborates that argument through her testimony, then the defendants can depose Mr.

7    Hsing on this topic — but only at the end of discovery for a total of 4.5 hours. That deposition can

8    include some inquiry into the hiring process, but only for necessary context to inform the testimony

9    about Mr. Hsing's interactions with Ms. Sheng about the Texas Instruments information.

10      If the parties' subsequent discovery alters this analysis, then they may raise the topics in a new

11    letter brief. The issue is preserved under Civil Local Rule 37-3 and can be addressed after the

12    other depositions. There is no argument about relevance or Federal Rule of Evidence 403, but any

13    issues can be addressed through pretrial filings.

14

15    **3.  Tseng Deposition (Letter Brief – ECF No. 142)**

16      The defendants want to depose Saria Tseng, Monolithic's Vice President, General Counsel,

17    and Corporate Secretary (since 2004), and Monolithic's Vice President, Strategic Corporate

18    Development (since 2009). They limit the deposition topics to (1) her knowledge of Monolithic's

19    confidential and trade-secret information and the measures Monolithic takes to protect it and (2)

20    Monolithic's allegations that Ms. Sheng and Mr. Dong breached their employment contracts by

21    competing against Monolithic during their employment. The focus is on point two. In the

22    operative complaint, Monolithic alleged that Ms. Sheng took a two-month leave of absence

23    starting on February 6, 2017, for unexplained personal reasons, and maintained her access to

24    Monolithic's confidential information.[15] The defendants contend that, contrary to that narrative,

25

26

27

28    ──────────

[15] First Am. Compl. – ECF No. 39 at 10 (¶¶ 39–40).

1    Ms. Tseng discouraged Ms. Sheng from quitting and encouraged her instead to take a leave of

2    absence that Monolithic "now claims extended her employment restrictions."[16]

3          The defendants describe the events surrounding the leave of absence. Ms. Sheng resigned and

4    gave two weeks' notice on January 20, 2017.[17] Initially someone at Monolithic named Maurice

5    Sciammas tried to convince her to stay, but on February 1, 2017, Ms. Sheng "st[uck] with [her]

6    previous decision."[18] She then signed exit paperwork and returned her work computer (through

7    Federal Express for delivery on February 3, 2017), which ended her access to Monolithic's

8    computer network.[19] Ms. Tseng had no previous relationship with Ms. Sheng but called her twice

9    during the two-week notice period, "purporting to empathize with Ms. Sheng's personal

10   circumstances and to persuade her to stay."[20] Ms. Sheng confided that she was a single mother

11   with a young child, could not travel much for work, and had two other job opportunities. Ms.

12   Tseng suggested that she take a leave of absence and said, "[t]hanks for confiding in me. I

13   understand the situation and have told no one about it including HR."[21]

14         Monolithic gave Ms. Sheng a leave of absence from February 6 to April 6, 2017.[22] In early

15   April, Monolithic HR personnel asked Ms. Sheng if she had changed her mind, she confirmed that

16   she had not, and Monolithic HR asked her for a second resignation letter because "it was needed

17   for documentation."[23] Ms. Sheng submitted a resignation letter on April 3, 2017, saying, "[a]s I

18   mentioned by phone earlier, I got an excit[ing] opportunity to work on something complete[ly]

19

20

21
—————————————————

22   [16] Disc. Letter Br. – ECF No. 142 at 4.

23   [17] *Id.*; Email, Ex. 2 to *id.* – ECF No. 142-3 at 2.

     [18] Email String, Ex. 3 to *id.* – ECF No. 142-4.

24   [19] Disc. Letter Br. – ECF No. 142 at 5; Email, Ex. 4 to *id.* – ECF No. 142-5; FedEx Receipts, Exs. 5–6
     to *id.* – ECF Nos. 142-6–142-7.

25   [20] Disc. Letter Br. – ECF No. 142 at 5; Email Strings, Exs. 7–8 to *id.* – ECF Nos. 142-8–142-9.

26   [21] Email String, Ex. 9 to *id.* – ECF No. 142-10.

27   [22] Letter, Ex. 10 to *id.* – ECF No. 142-11.

     [23] Disc. Letter Br. – ECF No. 142 at 5; Emails & Exit Docs., Exs. 11–17 to *id.* – ECF Nos. 142-12–
28   142-18.

United States District Court
Northern District of California

1    different at a local IC start-up company. Therefore I decided not to come back by the end of my

2    LOA [leave of absence], which is April 6, 2017. So my last day with MPS will be 4/6/17."[24]

3        Monolithic contends that Ms. Tseng oversees this litigation, Monolithic's confidentiality

4    practices are covered by other Rule 30(b)(6) witnesses, her knowledge about confidential or trade-

5    secret information is otherwise privileged, her conversations with Ms. Sheng are privileged and

6    work product, and — to the extent that the depositions seek her business insight — the apex

7    doctrine precludes her deposition.[25] The defendants counter that Ms. Sheng's leave of absence

8    resulted from her conversations with Ms. Tseng after Ms. Sheng resigned and that they should be

9    able to ask Ms. Tseng about her reasons for suggesting the leave and whether it was a ploy by a

10   sophisticated executive to try to foreclose Ms. Sheng from competing.[26]

11       A deposition is not warranted about confidentiality practices or the leave-of-absence

12   discussions: information is available from other sources, and Ms. Tseng's impressions about her

13   conversations with Ms. Sheng are work product and are not crucial to the defendants' preparation

14   of their case.

15       Rule 26 of the Federal Rules of Civil Procedure defines the scope of discovery:

16       Parties may obtain discovery regarding any nonprivileged matter that is relevant to
         any party's claim or defense and proportional to the needs of the case, considering
17       the importance of the issues at stake in the action, the amount in controversy, the
         parties' relative access to relevant information, the parties' resources, the
18       importance of the discovery in resolving the issues, and whether the burden or
         expense of the proposed discovery outweighs its likely benefit. Information within
19       this scope of discovery need not be admissible in evidence to be discoverable.

20   Fed. R. Civ. P. 26(b)(1).

21       If a party seeks relevant information that is proportional to the needs of the case, the party may

22   depose "any person" under Rule 30(a)(1), and there is no express prohibition against deposing an

23   attorney of record in a case. *Graff v. Hunt & Henriques*, No. C 08–0908 JF (PVT), 2008 WL

24   2854517, at *1 (N.D. Cal. July 23, 2008). Still, "[t]he Supreme Court . . . alluded to a presumption

---

[24] Email, Ex. 11 to *id.* – ECF No. 142-12.

[25] Disc. Letter Br. – ECF No. 142 at 2–3.

[26] *Id.* at 5.

United States District Court
Northern District of California

1    that trial counsel should not be forced to testify because doing so compromises the standards of

2    the legal profession." *Nocal, Inc. v. Sabercat Ventures, Inc.*, No. C 04-0240 PJH (JL), 2004 WL

3    3174427, at *2 (N.D. Cal. Nov. 15, 2004) (citing *Hickman v. Taylor*, 329 U.S. 495, 513 (1947));

4    *accord Mustang Mktg., Inc. v. Chevron Prods. Co.*, No. SA CV 02–485 DOC (MLGx), 2006 WL

5    5105559, at *3 (C.D. Cal. Feb. 28, 2006). For this reason, attorney depositions even for fact

6    discovery generally are allowed only when the discovery cannot be obtained from another source.

7    *Graff*, 2008 WL 2854517, at *1 (citing *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th

8    Cir. 1986)).

9        Attorney depositions should be permitted only where the party seeking the deposition shows

10   that (1) no other means exist to obtain the information, (2) the information sought is relevant and

11   nonprivileged, and (3) the information is crucial to the preparation of the case. *Shelton*, 805 F.2d at

12   1327. District courts in this district recognize *Shelton* as the leading case on attorney depositions

13   on matters relating to the pending case. *See, e.g., S.E.C. v. Jasper*, No. C07-06122 JW (HRL),

14   2009 WL 1457755, at *3 (N.D. Cal. May 26, 2009); *Fausto v. Credigy Servs. Corp.*, No. C 07-

15   05658, 2008 WL 4793467, at *1 n.2 (N.D. Cal. Nov. 3, 2008); *Graff*, 2008 WL 2854517 at *1; *see*

16   *also Nocal*, 2004 WL 3174427 at *2; *accord ATS Prods. v. Champion Fiberglass, Inc.*, No. 13-cv-

17   02403-SI (DMR), 2015 LEXIS 74015, at *8 (N.D. Cal. June 8, 2015).

18       *Shelton* is meant to protect against deposing an attorney regarding a pending case in part

19   because that might lead to disclosure of litigation strategy. *ATS*, 2015 LEXIS 74015, at *13 (citing

20   *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 729–30 (8th Cir. 2002)). By contrast, it was not

21   intended to block discovery of "relevant information uniquely known by [the plaintiff's] attorneys

22   about prior terminated litigation, the substance of which is central to the pending case." *Pamida*,

23   281 F.3d at 731; *see also In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2nd Cir.

24   2003) (applying a more flexible standard and considering various factors, including the need to

25   depose the lawyer, the lawyer's connection to the discovery, the risk of encountering privilege and

26   work product, and the extent of discovery already conducted).[27]

27   _____

28   [27] In *Pamida*, a patentholder sued Pamida for selling shoes that infringed her patent. Pamida

United States District Court
Northern District of California

1    The discovery also implicates attorney-client privilege and the work-product doctrine.

2    The Ninth Circuit has defined the relevant standard for determining privilege:

3        (1) Where legal advice of any kind is sought (2) from a professional legal adviser in
         his capacity as such, (3) the communications relating to that purpose, (4) made in
4        confidence (5) by the client, (6) are at his instance permanently protected (7) from
         disclosure by himself or by the legal adviser, (8) unless the protection be waived.
5

6    *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (cleaned up). The attorney-client

7    privilege does not apply to an attorney's communications about business matters (as opposed to

8    legal advice). *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal.

9    2002). "Corporations may not conduct their business affairs in private simply by staffing a

10   transaction with attorneys." *Id.*

11       "[The] party asserting the attorney-client privilege has the burden of establishing the [existence

12   of an attorney-client] relationship and the privileged nature of the communication." *Ruehle*, 583

13   F.3d at 607. In other words, "[t]he party asserting the privilege bears the burden of proving each

14   essential element" of the attorney-client-privilege test. *Id.* at 608. "Because it impedes full and free

15   discovery of the truth, the attorney-client privilege is strictly construed." *Id.*

16       "The work-product doctrine protects from discovery documents and tangible things prepared

17   by a party or his representative in anticipation of litigation." *United States v. Richey*, 632 F.3d 559,

18   567 (9th Cir. 2011) (cleaned up). The party asserting work-product protection has the burden of

19   establishing that the work-product doctrine applies to the document or tangible thing in question.

20   *Callwave Commc'ns, LLC v. Wavemarket, Inc.*, No. C 14-80112 JSW (LB), 2015 WL 831539, at

21   *2 (N.D. Cal. Feb. 23, 2015) (citing *Skynet Elec. Co. v. Flextronics Int'l, Ltd.*, No. C 12-06317-

22

23   _____

24   rejected the patentholder's early settlement offer and instead engaged in costly litigation that
     ultimately resulted in a settlement. 281 F.3d at 728. Before the case settled, Pamida sued its
     manufacturer Dynasty for indemnification. *Id.* Pamida's lawyers were the same in both lawsuits. *Id.*
25   at 728–29. The court allowed discovery into Pamida's notice to Dynasty and the reasonableness of
     fees; the court held that the issue should be evaluated under Rule 26 and that Pamida waived any
26   claims of attorney-client privilege or work product by filing its lawsuit. *Id.* at 730–31. Similarly, the
     *ATS* court applied Rule 26 when considering whether to allow the deposition of a party's attorney
27   who had percipient information from a prior concluded settlement negotiation that was relevant to
     the pending trade-secrets case. 2015 LEXIS 74015, at *18–19. The court disallowed the deposition
     based on burden and the availability of information from other sources but said that it would permit
28   the deposition if ATS called its attorney as a trial witness. *Id.* at *20–21.

United States District Court
Northern District of California

WHA, 2013 WL 6623874, at *4 (N.D. Cal. Dec. 16, 2013)). "For work product, protection is waived where disclosure of the otherwise privileged documents is made to a third party, and that disclosure enables an adversary to gain access to the information." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 580 (N.D. Cal. 2007) (cleaned up). This may occur where "a party discloses protected information to a third party who is not bound to maintain its confidence, or otherwise shows disregard for the protection by making the information public." *Great Am. Assur. Co. v. Liberty Surplus Ins. Co.*, 669 F. Supp. 2d 1084, 1092 (N.D. Cal. 2009) (cleaned up).

Information about Monolithic's security practices for its confidential and trade-secret information is obtainable from other sources. So too are its reasons for negotiating a leave of absence for Ms. Sheng. Under *Shelton* or an apex analysis, the only evidence that arguably is allowable as percipient-witness evidence is Ms. Tseng's state of mind about her phone conversations with Ms. Sheng. The communications themselves are not privileged or work product. *Monolithic Power Sys., Inc. v. Intersil Corp.*, No. 5:18-mc-80060-HRL, 2018 WL 1993537, at *2 (N.D. Cal. Apr. 27, 2018). The emails have been produced, and the conversations apparently are not disputed. But Ms. Sheng's impressions are at least work product. *United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (analyzing the difference (and overlap) between business and legal advice); *Tennison v. City & Cnty. of San Francisco*, 226 F.R.D. 615, 623 (N.D. Cal. 2005) (discussing opinion work product). The depositions are not allowed based on burden, availability of information from other sources, and (for the mental impressions) opinion work product. (This analysis would change if Monolithic disputes the content of the calls or called its attorney as a trial witness. *ATS*, 2015 LEXIS 74015, at *18–21. Monolithic says that Ms. Tseng will not testify about any conversations with Ms. Sheng.[28])

### 4. Deposition Location (Letter Brief – ECF No. 136)

Monolithic wants to depose its former employees (Ms. Sheng and Mr. Dong, who are also Rule 30(b)(6) designees) in person in the United States, both in their personal capacities and as

---

[28] Disc. Letter Br. – ECF No. 142 at 3.

1    Meraki's Rule 30(b)(6) designees. They have residences here. The defendants want remote

2    depositions or in-person depositions in Macau or Hong Kong.[29] The depositions will be in person

3    in Hong Kong or Macau or remote.

4          "A party may unilaterally choose the place for deposing the opposing party, subject to the

5    granting of a protective order" under Fed. R. Civ. P. 26(c)(2). *Music Grp. Macao Com. Offshore*

6    *Ltd. v. Foote*, No. 14-cv-3078-JSC, 2015 WL 13423886, at *1–2 (N.D. Cal. Aug. 11, 2015).

7    District courts have wide discretion to establish the time and place of depositions. *Hyde & Drath*

8    *v. Baker*, 24 F.3d 1162, 1166 (9th Cir. 1994). There is a "general presumption that the deposition

9    of a defendant should be conducted in the district of his residence because while plaintiffs bring

10   the lawsuit and . . . exercise the first choice as to the forum, the defendants, on the other hand, are

11   not before the court by choice." *Music Grp.*, 2015 WL 1342886, at *1 (cleaned up). There is a

12   presumption that the deposition of a corporate defendant should be conducted at the corporation's

13   principal place of business. *Id.* In considering the appropriate location for the deposition of a

14   corporate witness, courts consider factors such as (1) the location of counsel in the forum district,

15   (2) the number of representatives a party seeks to depose, (3) the likelihood of significant

16   discovery disputes that would require resolution by the forum court, (4) whether the deponents

17   often travel for business, and (5) the equities with respect to the nature of the claims and the

18   parties' relationship. *Music Grp.*, 2015 WL 1342886, at *2.

19         The former employees are U.S. citizens and own U.S. residences where their adult children

20   live and that they claim as "owner occupied" for tax purposes. They have lived in China (also

21   Meraki's principal place of business) since 2017 and work there, Ms. Sheng has a minor child

22   there, both have elderly parents, they have traveled infrequently to the U.S., have not been here for

23   three years, and are not vaccinated against COVID-19.[30] Mainland China does not permit

24   depositions for use in foreign courts. *Wang v. Hull*, No. C18-1220RSL, 2020 WL 4734930, at *1

25

26   ───────────────────

     [29] Disc. Letter Br. – ECF No. 136.

27   [30] *Id.* at 2–3, 6; Real Prop. Tax Assessor Rs., Exs. A & B to *id.* – ECF No. 136-1 at 2 (Mr. Dong) &
     ECF No. 136-2 at 2 (Ms. Sheng); Passports, Ex. E to *id.* – ECF No. 135-2; Sheng Decl., Ex. 1 to *id.* –
28   ECF No. 136-8 at 4 (¶ 15); Dong Decl., Ex. 2 to *id.* – ECF No. 136-9 at 4 (¶ 12).

1   (W.D. Wash. June 22, 2020); *Shenzen Synergy Digit. Co. v. Mingtel, Inc.*, 2021 WL 6072565, at

2   *2 (E.D. Tex. Dec. 23, 2021).

3       The defendants suggest remote depositions or in-person depositions in Hong Kong or Macau

4   and point to Monolithic's refusal to produce its own China-based witnesses here.[31] Monolithic

5   counters that it will produce its U.S. citizen-witnesses here, Hong Kong requires COVID-19

6   vaccines, Macau requires a quarantine for U.S. travelers for eight days, and travel to Macau and

7   Hong Kong is unsafe for Monolithic's U.S. counsel.[32] The U.S State Department advises travelers

8   to Hong Kong and Macau to "reconsider travel" (one level below "do not travel") based on a

9   "surge in COVID-19 cases, arbitrary enforcement of local laws, and COVID-19 related

10  restrictions."[33]

11      In-person depositions are appropriate: Monolithic wants to test the witnesses' credibility and

12  efficiently review extensive documents.[34] The question is where. Hong Kong may not be an option

13  if its vaccination requirements have not changed. That leaves Macau or the U.S. (and possibly

14  Singapore, for the reasons discussed at the hearing). The easiest location is California: it is fairly

15  easy to get here from Asia, and any in-person deposition requires travel. But given the defendants'

16  business and familial responsibilities, the burdens and equities do not favor depositions here. The

17  defendants' transfer of the Texas case to this district does not change that outcome: combining the

18  two cases here makes sense, and the parties' agreement had a forum-selection clause. Thus, the

19  depositions can be in person in Macau or Hong Kong or they can be remote. (This does not

20  preclude the parties from agreeing to other deposition locations.)

21      Citing *United States v. $160,066.98 from Bank of Am.*, Monolithic contends that the State

22  Department's Macau travel advisory is dispositive.[35] 202 F.R.D. 624 (S.D. Cal. 2001). That case is

23  distinguishable. The claimants there were Pakistani nationals who intervened to claim funds subject

25  [31] Disc. Letter Br. – ECF No. 136 at 7.

26  [32] U.S. Consulate Gen. Hong Kong & Macau COVID-19 Info., Ex. 3 to *id.* – ECF No. 136-10 at 2, 4, 14.
    [33] Travel Advisory, Ex. F to *id.* – ECF No. 136-6 at 2.

27  [34] Disc. Letter Br. – ECF No. 134 at 7.

28  [35] *Id.* at 4.

United States District Court
Northern District of California

1   to forfeiture. They wanted their depositions to take place in Pakistan or telephonically. *Id.* at 625.

2   The State Department warned U.S. citizens to "evaluate carefully the implications for their security

3   and safety" before traveling to Pakistan because "[e]vents in the Middle East have increased the

4   possibility of violence." *Id.* at 628 n.3. The court ordered in-person depositions in the U.S., partly

5   because the claimants joined the litigation and thus "subject[ed] themselves to the jurisdiction of the

6   court" and partly because telephonic depositions were unreliable. *Id.* at 627–29. The deponents here

7   are non-resident defendants, and remote video depositions are reliable. *Cf. Music Grp.*, 2015 WL

8   13423866, at *2 (the plaintiff did not show prejudice from a remote deposition).

9       That said, Macau poses some issues. The court urges the parties to try to work these issues out.

10   Litigation inconveniences everyone, and this is an issue where the parties might try to make it easier

11   on each other, including the lawyers.

12

13                                    **CONCLUSION**

14   This order resolves the discovery disputes in ECF Nos. 132, 134, 136, and 142.

15   **IT IS SO ORDERED.**

16   Dated: January 20, 2023

17   _____

18   LAUREL BEELER
     United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California